**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

SCHOOL DISTRICT OF PITTSBURGH,

    Plaintiff,

              v.                    16-cv-92

                                        **ELECTRONICALLY FILED**

C.M.C., *a minor, and her parents*,
C.C. and L.M.,

    Defendants.

**MEMORANDUM OPINION RE: PARTIES CROSS-MOTIONS FOR SUMMARY
JUDGMENT (DOC. NOS. 24 AND 27) AND PLAINTIFF'S MOTION FOR RELIEF OF
JUDGMENT BASED UPON NEWLY ACQUIRED EVIDENCE (DOC. NO. 16)**

    **I.**    **Introduction**

This is a civil rights action which centers on a public school district's alleged failure to accommodate a student with disabilities. Plaintiff, the School District of Pittsburgh (hereinafter "Plaintiff" or "School District") seeks relief from a Hearing Officer's decision finding that it failed to offer a Free Appropriate Public Education (FAPE) under the Individuals with Disabilities Education Act (hereinafter "IDEA"), 20 U.S.C. §§ 1400 *et seq.*, to C.M.C. (hereinafter "student" or by and through her parents and on their own behalf, "defendants"). The School District contends in its Complaint that the Hearing Officer erred in finding: (1) it failed to provide C.M.C. with a FAPE, (2) the private placement chosen by defendants was appropriate, (3) the balancing of the equities did not favor the School District, (4) that defendants are eligible for reimbursement for Extended School Year Services, and (5) that defendants are eligible for reimbursement for transportation costs. (Doc. No. 1). The School District seeks reversal of the Hearing Officer's decision which requires it to pay tuition reimbursement for the full cost of

1

attendance at The University School (hereinafter "private school"), the private school at which C.M.C. is currently enrolled. Presently before this Court are Cross-Motions for Summary Judgment, (doc. nos. 24 and 27), and Plaintiff's Motion for Relief of Judgment Based Upon Newly Acquired Evidence (doc. no. 16). For the reasons that follow, this Court will GRANT Defendants' Motion for Summary Judgment (doc. no. 27), DENY Plaintiff's Motion for Summary Judgment (doc. no. 24), and DENY Plaintiff's Motion for Relief of Judgment (doc. no. 16).

II. **Statement of Facts**

The factual history of this case may be fairly summarized as follows. C.M.C., who resides in the Pittsburgh School District along with her parents, was 15 years old when the parties met in the summer of 2014 to discuss her program and placement for the tenth grade. Doc. No. 32 at Defendant's Concise Statement of Material Facts, at ¶¶ 1-2. Among other things, C.M.C. as been diagnosed with Asperger's Disorder, ADHD, Anxiety Disorder, Depressive Disorder, Mathematics Disorder, and Sensory Integration Disorder. *Id*. at Plaintiff's Concise Statement of Material Facts, ¶ 3. Prior to the tenth grade, C.M.C. attended private school from Kindergarten through fourth grade, public school from fifth grade through eighth grade, and private school again for ninth grade. *Id.* at ¶¶ 4, 8. During her third grade year the School District evaluated her and determined she was eligible for special education with a primary disability category of Autism. *Id.* at ¶¶ 5-7. The parents declined the special education services at the time and C.M.C. remained enrolled in private school until the fifth grade. *Id.* at ¶ 7.

In April 2013, during her eighth grade year (in public school), C.M.C. was involved in a physical altercation with another student.[1]  *Id.* at ¶ 9.  The other student was African-American.  *Id.* at ¶ 11.  As a result of the incident, C.M.C. is fearful of students who may look similar to the student involved in the altercation, particularly African-American teenage girls.  *Id.* at ¶¶ 12-13.  She returned to school several days after the altercation but her psychiatrist later wrote a request for homebound education and she remained on homebound until the end of the school year.  *Id.* at ¶¶ 14-16.  Her therapist opined that C.M.C. suffered from Post-Traumatic Stress Disorder ("PTSD") and that returning to the school building where the physical altercation occurred would have caused an increase of her emotional and psychological symptoms, which in turn would have caused her to avoid the building.  *Id.* at ¶ 17.  The school principal testified that C.M.C. briefly returned (for 30-45 minutes) to the building with her mother, during which the principal observed her socializing with peers and staff without any apparent distress.  *Id.* at ¶ 18.

An Individualized Education Program (hereinafter "IEP") was drafted for C.M.C. to return to public school for ninth grade (the 2013-2014 school year) but her parents elected to have their daughter attend private school instead.  *Id.* at ¶ 19.

On March 11, 2014, Defendants sent a letter to the School District requesting that it pay for C.M.C.'s private school, The University School.  *Id.* at ¶ 20.  The School District replied in a timely manner and requested that the school psychologist conduct an evaluation.  *Id.* at ¶¶ 22-23.  The psychologist met with C.M.C.'s parents in their home, met with the student individually, and arranged meetings with her teachers at The University School.  *Id.* at ¶¶ 24, 26.  At the initial meeting, her parents indicated they wanted their daughter to attend private school.  *Id.* at ¶ 25.

---

[1] The parties dispute whether the altercation was mutual and who initiated it.  *See id.* at ¶ 10.  The Court concurs with Defendants that this dispute is not material to the present case.

The psychologist's evaluation report recommended that C.M.C. receive special education and related services according to the IDEA under a primary disability category of Autism and a Specific Learning Disability in mathematics. *Id.* at ¶ 28. Two meetings were held to review the evaluation results with C.M.C.'s parents. *Id.* at ¶ 29.

A Functional Behavioral Assessment (FBA) was conducted and used to develop the Positive Behavioral Support Plan (PBSP). *Id.* at ¶ 31. Two additional meetings were held along with numerous email correspondence and telephone conversations between the School District and C.M.C.'s parents to discuss C.M.C.'s IEP and PBSP. *Id.* at ¶ 32. The IEP and PBSP provided various related services including rehabilitation counseling, travel training, social skills programming, and counselling. *Id.* at ¶ 33. The IEP included annual goals with short term objectives addressing listening comprehension, reading comprehension, mathematics, and skills for task completion. It also included program modifications and items of specially designed instruction such as review and discussion of current knowledge when new material was introduced, small group instruction, a tutoring approach rather than lectures, multisensory approaches, avoidance of multi-tasking, and computer-based instruction for mastery of concepts. *Id.* at ¶ 34.

Throughout the meetings and development of the IEP, C.M.C.'s parents continued to oppose placement in the public school, Allderdice High School. *Id.* at ¶ 36. Accordingly, the School District requested that C.M.C.'s parents visit the District's online academy. *Id.* at ¶ 38. The School District proposed C.M.C. attend core subjects at the online academy and "specials" and related services at Allderdice. Plaintiff claims the purpose was to ease the student's transition back into the school; Defendants aver that the reason for the hybrid approach was

never communicated to them. *Id.* at ¶ 39. Under the plan, the hybrid approach would last for 45 days. *Id.* at ¶ 40. The parties dispute what was to happen after the 45 days. According to the School District, the 45 days was a transition period, after which the IEP team would meet to discuss C.M.C.'s progress and full transition into Allderdice. Defendants contend it simply stated "that C.M.C.'s educational placement be reviewed after 45 days (the first quarter of the school year) in order to assess its continued appropriateness." *Id.* at ¶ 40.

The online academy has a drop-in center where students may attend school in person and meet with online academy staff. It has a full-time special education instructor and other staff who are available to meet with students in person, via telephone, or via virtual meeting. *Id.* at ¶ 41. The principal of the online academy testified that C.M.C.'s special education programing could be provided at the online academy. *Id.* at ¶ 43.

After the 2014-2015 school year began (C.M.C.'s tenth grade year) and the School District issued a Notice of Recommended Educational Placement (NOREP), C.M.C.'s parents visited the online academy and concluded it would not be appropriate for their daughter. *Id.* at ¶ 44. During one of these meetings, C.M.C.'s mother stated that her daughter was fearful of African-American teenage girls as a result of the altercation in eighth grade. *Id.* at ¶ 45. C.M.C. was then enrolled in The University School for tenth grade.

The University School is a private school that is licensed by the Pennsylvania Department of Education. *Id.* at ¶ 46. The Director of The University School testified that class sizes are small and the school has a total enrollment of approximately 28 students. *Id.* at ¶ 47. C.M.C. does not have an IEP at The University School. *Id.* at ¶ 49. C.M.C. continues to attend the private school. *Id.* at ¶ 58.

5

On August 25, 2015, August 26, 2015, and October 9, 2015, due process hearing sessions were conducted by an Office for Dispute Resolution Hearing Officer. *Id.* at ¶ 60. On November 30, 2015, the Hearing Officer issued a decision in favor of Defendants. *Id.* at ¶¶ 60-61. In the decision, the Hearing Officer ordered the School District to provide tuition reimbursement for the 2014-2015 and 2015-2016 school years, tuition reimbursement for the summer of 2015, and reimbursement for transportation expenses incurred for those school years. *Id.* at ¶ 61. The School District filed the present action seeking review of the Hearing Officer's decision by this Court. *Id.* at ¶ 62.

**The Hearing Officers Decision**

The Hearing Officer's decision includes an extensive recitation of her findings of fact. Doc. No. 25-2 at 4-11. The Hearing Officer then concludes that while "[t]here are several aspects of the proposal that would reasonably address some of Student's needs . . . . there are other, more troubling aspects of the proposal that weigh against its appropriateness." *Id*. at 13-14. In particular:

> The evidence overwhelmingly establishes that Student has difficulty completing assignments and remaining on task; and that instruction in the form of small group instruction and/or a tutoring approach provides the structure that Student requires, whereas Student would not benefit from presentation of instruction via lectures. Additionally, it is uncontroverted that Student's use of a computer for learning is appropriate only for practice and mastery of skills rather than for presentation of new material. Even the District's school psychologist stopped short of recommending online programming for Student. Furthermore, Student requires structure and consistency, including continual prompting and checks for attention, that cannot be provided in a virtual environment even with periodic telephone contact and computer-generated meetings. Moreover, it is questionable whether, given Student's anxiety, Student could be adequately reassured through reminders of and links to current knowledge when introduced to novel concepts, or would take advantage of a "Help" button or similar feature.

6

*Id*. at 14. The Hearing Officer further found that the drop-in center was insufficient to adequately address these concerns. *Id*. at 14. Additionally, the Hearing Officer determined the School District's plan, which included the online academy, the drop-in center, and weekly social skills group, did not meet C.M.C.'s needs for social skills and successful peer interactions. *Id*. at 15-16.

With respect to the eventual inclusion of Allderdice High School into the plan, the Hearing Officer found that the size of the school was not enough to render the plan inappropriate. However, she noted that given C.M.C.'s anxiety about entering such a building, "very careful and thoughtful planning" would be necessary should the parties consider this placement again. *Id*. at 16.

The Hearing Officer then concluded that The University School was an appropriate placement for the student because testimony of the teachers and director that C.M.C. "was demonstrating academic success was credible and persuasive." *Id*. at 18. She noted that the School District's arguments regarding The University School's curriculum and grading were not compelling. *Id*. at 18.

In balancing the equities, the Hearing Officer did not agree with the School District that Defendants never seriously considered Plaintiff's final proposed IEP and NOREP. She also found that C.M.C.'s parents were engaged in a collaborative effort with the School District. *Id*. at 19.

### III. Standard of Review

Summary judgment may be granted if, drawing all inferences in favor of the non-moving party, "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986). "Facts that could alter the outcome are material facts." *Charlton v. Paramus Bd. of Educ.,* 25 F.3d 194, 197 (3d Cir. 1994). Disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson,* 477 U.S. at 248.

A party moving for summary judgment has the initial burden of supporting its assertion that fact(s) cannot be genuinely disputed by citing to particular parts of materials in the record – i.e., depositions, documents, affidavits, stipulations, or other materials – or by showing that: (1) the materials cited by the non-moving party do not establish the presence of a genuine dispute, or (2) that the non-moving party cannot produce admissible evidence to support its fact(s). Fed.R.Civ.P. 56(c)(1).

Conversely, in order to defeat a motion for summary judgment, the non-moving party must support its assertion that fact(s) are genuinely disputed by citing to particular parts of materials in the record, or by showing that: (1) the materials cited by the moving party do not establish the absence of a genuine dispute, or (2) the moving party cannot produce admissible evidence to support its fact(s). *Id.*

In reviewing a motion for summary judgment, the Court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." *Siegel Transfer, Inc. v. Carrier Express, Inc.,* 54 F.3d 1125, 1127 (3d Cir. 1995).

**Review of Administrative Record**

Where, as here, both parties appeal from a Due Process Hearing determination, the Court applies a standard of review which is different from that of the typical summary judgment proceedings. Once a party initiates an appeal from the administrative Due Process findings, the IDEA provides that the Court, "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the Court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B).

Essentially, the above statutory language calls for a "modified version of *de novo* review," requiring this Court to "give due weight to the factual findings of the [hearing office]." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006) (internal citations omitted). In doing so, this Court "should defer to the hearing officer's findings based on credibility judgments unless the non-testimonial, extrinsic evidence in the record would justify a contrary conclusion or unless the record read in its entirety would compel a contrary conclusion." *S.H. v. State-Operated Sch. Dist. of City of Newark*, 336 F.3d 260, 270 (3d Cir. 2003) (quoting *Carlisle Area Sch. v. Scott P.*, F.3d 520, 527 (3d Cir. 1995)). The burden of proof rests with the party seeking relief, in this case the School District. *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012).

## IV. Discussion

Parents who unilaterally remove their child from public school and place him or her in private school are entitled to tuition reimbursement under the IDEA if three elements are proven: (1) the School District failed to offer the student a FAPE, (2) the private school placement is appropriate, and (3) equitable considerations favor reimbursement. *Florence Cnty Sch. Dist. Four v. Carter*, 510 U.S. 7, 15-16 (1993). The Hearing Officer in this case found in favor of C.M.C and her parents on each of the three elements. Doc. No. 25-2 at 2-20. The School District now contests all three elements as well as the Hearing Officer's award of reimbursement for transportation expenses and summer programming. (Doc. No. 25). The School District also filed a Motion for Relief of Judgment Based Upon Newly Acquired Evidence pursuant to FED.R.CIV.P. 60(b)(2) which the Court will discuss first. Doc. No. 16.

### a. Plaintiff is not Entitled to Relief of Judgment Based Upon Newly Acquired Evidence.

FED.R.CIV.P. 60(b)(2) provides that a court may relieve a party from a final judgment if there is "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial[.]" The School District avers that it was recently made aware that from November 13, 2015, through December 4, 2015, and during May of 2016, C.M.C. attended a partial hospitalization program through Mercy Behavioral Health. Doc. No. 16 at ¶¶ 3-5. The partial hospitalization program operates during the school day and utilizes a course of treatment that includes, in part, daily instruction in a therapeutic classroom at Mercy Behavioral Health which is operated by the School District. *Id.* at ¶ 8. The School District takes the position that these recent developments show that the private placement was insufficient and

10

that the School District's proposed placement was appropriate. *Id.* at ¶¶ 8-13. The Court does not find this argument compelling.

As an initial matter, courts are hesitant to use events which occur after a student's placement in evaluating that placement. *See Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 762 (3d Cir. 1995) ("we stress that such after-acquired evidence, such as information received through experience of an alternative placement, should be used by courts only in assessing the reasonableness of the district's initial decisions regarding a particular IEP . . . . Courts must be vigilant to heed Judge Garth's warning that '[n]either the statute nor reason countenance 'Monday Morning Quarterbacking' in evaluating the appropriateness of the child's placement'").

While perhaps ironic, the fact that the School District operates some portion of a partial hospitalization program which C.M.C. attended for relatively short periods of time does not, by itself, show that the specific IEP it offered C.M.C. and her parents constituted a FAPE. The ultimate question remains whether or not the IEP offered to C.M.C. constituted a FAPE, not whether C.M.C. could benefit from any service performed by the School District. The IEP offered C.M.C. a 45-day period through the online academy plus additional support services to transition her back into the regular school environment. Plaintiff has not established that the therapeutic classroom it operates in Mercy Behavior Health is at all comparable to the online academy, let alone Allderdice High School, into which it eventually intended to integrate C.M.C.

To the extent the School District is also arguing that this new evidence shows C.M.C.'s placement at The University School is inappropriate, the Court is unconvinced. C.M.C. has significant psychological and behavioral problems. That she may occasionally need more intensive mental health treatment for short periods of time does not necessarily render the private

school inappropriate. *See infra* at 15-16 (private placement does not have to be "perfect," only provide "significant learning" and "meaningful benefit"). Therefore, the Court will deny Plaintiff's Rule 60(b)(2) Motion.

### b. The Hearing Officer did not err in finding that the School District failed to provide C.M.C. with a FAPE.

A FAPE is "an educational instruction 'specially designed . . . to meet the unique needs of a child with a disability,' coupled with any additional 'related services' that are required to assist a child with a disability to benefit from [that instruction].'" *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.,* 550 U.S. 516, 524-25 (2007) (citing 20 U.S.C. § 1401(29)). The FAPE promised to students in the IDEA is not a perfect or ideal education. The Congressional purpose of the IDEA was to "open the door of public education to handicapped children on appropriate terms" more than it was intended to "guarantee any particular level of education once inside." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley,* 458 U.S. 176, 192 (1982); *see also K.C. ex rel. Her Parents v. Nazareth Area Sch. Dist.*, 806 F.Supp.2d 806, 813 (E.D. Pa. 2011) (explaining that a FAPE is not a guarantee of the "best possible" or maximal education); *Carlisle Area Sch. v. Scott P. By and Through Bess P.*, 62 F.3d 520, 534 (3d Cir. 1995) (defining the duty of schools under the IDEA as to provide a "floor of opportunity," not to provide "optimal" levels of service).

To satisfy its duty to provide a qualifying student with a FAPE, a school district must develop an Individualized Educational Plan (IEP) that responds to the student's identified educational needs by identifying the student's present abilities, goals for improvement, services designed to meet those goals, and a timetable for reaching those goals. *D.S. v. Bayonne Bd. of*

*Educ.,* 602 F.3d 553, 557 (3d Cir. 2010); *see also* 20 U.S.C. §§ 1412(a)(4), 1414(d)(1)(A)(i); *Holmes v. Millcreek Twp. Sch. Dist.,* 205 F.3d 583, 589 (3d Cir. 2000).

To adequately provide an appropriate education under the IDEA, an IEP must be "reasonably calculated to enable the child to receive educational benefits." *K.C.,* 806 F.Supp.2d at 813 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. V. Rowley*, 458 U.S. 176, 207 (1982) (stating FAPE was "sufficient to confer some [ ] benefit")). Though maximal or optimal educational services or results are not guaranteed under the IDEA, a school district must, in designing an IEP, identify goals for meaningful improvement relating to a student's potential. *P.P. ex rel. Michael P. v. West Chester Area Sch. Dist.,* 585 F.3d 727, 729-30 (3d Cir. 2009).

While an IEP must be developed in consideration of a student's potential and with an eye to long-term goals, evaluations of the adequacy of an IEP can only be determined "as of the time it was offered to the student, and not at some later date." *Fuhrmann v. East Hanover Bd. of Educ.,* 993 F.2d 1031, 1040 (3d Cir. 1993) (citing *Rowley,* 458 U.S. at 206–07).

The School District avers that it provided C.M.C. with a FAPE. In doing so, it argues that the basis of Defendants' complaint "rests solely on the grounds of antiquated, unsupported, and unconscionable opinions of race" and that race was a motivating factor in both their initial complaint and the Hearing Officer's decision. Doc. No. 25 at 2. In other words, that C.M.C.'s parents did not want her to attend Allderdice because of her fear of African-American students following the altercation in eighth grade.

The Court declines to decide whether such concerns involving a student suffering from Autism and PTSD would be an inappropriate basis for finding a lack of FAPE. Contrary to the

School District's assertion, C.M.C.'s anxiety around African-American students was not the basis for the Hearing Officer's decision. The only reference to this issue in the Hearing Officer's decision is one finding of fact noting that the altercation took place and that C.M.C. suffers from PTSD, the symptoms of which may be triggered "by individuals who were present at the time of the incident as well as circumstances that were similar to those surrounding the event." Doc. No. 25-2 at 5. For this finding of fact, the Hearing Officer cites to testimony regarding C.M.C.'s anxiety around African-American teenage girls. *Id*. The Hearing Officer did not, however, find this as a basis for concluding the School District failed to provide a FAPE. Rather, the Hearing Officer specifically discussed that the size and other characteristics of Allderdice High School would not categorically prevent C.M.C.'s placement there. *Id*. at 16. The issue, therefore, is not relevant to the case and the Court will not reverse the Hearing Officer's decision on the grounds that it was based on inappropriate racial considerations.

The School District spends very little of its brief addressing the actual concerns highlighted in the Hearing Officer's decision. It declares only that the Hearing Officer's finding that the online academy could not provide adequate structure or consistency was "unclear and unfounded," but does not provide further argument. Doc. No. 25 at 7. The School District supplements this assertion by quoting select parts of the Hearing Officer's decision that reflect positively on the School District's proposed plan. *Id*. In the Court's view, the fact that the Hearing Officer remarked positively on certain aspects of Plaintiff's plan does not negate the fact that the Hearing Officer also found serious problems with it.

The School District has not directed the Court's attention to specific evidence contradicting the Hearing Officer's decision. Rather, it is undisputed that C.M.C. suffers from a

litany of psychological and emotional problems, including: Asperger's Disorder, ADHD, Anxiety Disorder, Depressive Disorder, PTSD, Mathematics Disorder, and Sensory Integration Disorder. In February 2013, C.M.C. underwent a private psychological evaluation. The psychologist diagnosed her with the illnesses described above and reported that her difficulties were increasing. Doc. No. 25-5 at 4. In particular, the psychologist noted declining grades, increased anxiety levels, and a long list of troubling behaviors. *Id*. C.M.C.'s treating clinician subsequently reported "dramatic improvement" when C.M.C. started at The University School. The clinician described the smaller and specialized academic environment at The University School as required to support C.M.C.'s success. *Id*.

The School District's psychologist testified that C.M.C. should not learn via computer and that computer-based learning should only be used to supplement other types of instruction. Doc. No. 25-3 at 43, at 163. Additionally, there was testimony from multiple other individuals indicating that C.M.C. is obsessed with computers and the internet and has particular difficulty staying focused when performing schoolwork on a computer. *Id.* at 101, 124, 148-49, 158, at 278, 368, 399-400, 436-38. Despite this, the plan proposed by the School District utilized the online academy as the primary method of instruction for at least the first 45 days.

In sum, the record supports the Hearing Officer's decision that the proposed plan was not adequate to constitute a FAPE. The Court agrees with the Hearing Officer that the School District appears to have worked hard in making a good faith effort to accommodate C.M.C. However, there is no basis in the record or the School District's briefing to reverse the Hearing Officer's decision.

### c. The Hearing Officer did not err in finding The University School was an appropriate placement for C.M.C.

If the public school fails to provide a FAPE, the next step of the inquiry is to determine if the private placement chosen by the parents is appropriate. A private placement is appropriate if it provides "significant learning" and confers "meaningful benefit." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 276 (3d Cir. 2007). However, "the 'parents of a disabled student need not seek out the perfect private placement in order to satisfy the IDEA." *Mary T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 242 (3d Cir. 2009) (quoting *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 249 n. 8 (3d Cir. 1999). Placement is not necessarily inappropriate even where the private school is not a "Pennsylvania approved private school," is not licensed to provide special education programing, its teachers lack certain certifications, it fails to meet state education standards, or where it does not provide the student with an IEP. *DeFlaminis*, 480 F.3d at 276.

The School District takes issue with several aspects of The University School. Doc. 25 at 8-11. Most of the things the School District points to, such as teaching certification issues and the fact that C.M.C. does not have an IEP, are not sufficient to render placement inappropriate under the case law. *DeFlaminis*, 480 F.3d at 276. The School District also points to syllabus-like documents which were submitted to the Pennsylvania Department of Education describing the curriculum in C.M.C.'s classes at The University School. Doc. No. 25 at 10. It argues that these one-page documents show that the classes are "devoid of essential elements" and lack many of the benchmarks in the Pennsylvania Core Standards. *Id*. With respect to this argument, the Hearing Officer found: "I cannot conclude that the materials submitted for licensing purposes to PDE constitute the entire spectrum of educational programming of its students; the evidence instead establishes that Private School is providing Student with the opportunity to make

16

meaningful growth academically, socially, and emotionally." Doc. No. 25-2 at 18-19. Given that the Hearing Officer made this determination after hearing testimony from several teachers at the University School and its director, such a credibility determination is entitled to deference absent compelling extrinsic evidence to the contrary. The Court can find no such evidence in the record. The evidence suggests C.M.C. is doing well at The University School, which is licensed by the Pennsylvania Department of Education. The precise nature of the syllabus-like documents is not clear from the record and a private school's failure to meet state education standards does not necessarily render placement inappropriate. *DeFlaminis*, 480 F.3d at 276. The Court, therefore, concludes that C.M.C.'s private placement at The University School is appropriate.

### d. The Hearing Officer did not err in balancing the equities.

The third step of the inquiry is to balance the equities. "[C]ourts retain discretion to reduce the amount of a reimbursement award if the equities so warrant . . . ." *Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246-47 (2009). The School District argues the equities favor reduction of the reimbursement award for two reasons: (1) C.M.C.'s parents did not provide adequate notice of their intent to enroll her in private school, and (2) C.M.C.'s parents acted unreasonably in that they "never had an open-mind" and never intended to accept the School District as a placement. Doc. No. 25 at 12.

The School District's argument regarding notice appears to be that C.M.C.'s parents removed her to private school for the 2013-2014 school year (C.M.C.'s ninth grade year) and then did not request reimbursement until March 11, 2014. *Id.* However, Defendants only received reimbursement for the 2014-2015 and 2015-2016 school years. Doc. No. 25-2 at 20.

17

They notified the School District towards the end of the 2013-2014 school year and thus gave the School District ample notice to create an IEP for the following year. The Court sees no reason to reduce the tuition reimbursement award for lack of notice where the parents removed their child without notice but only sought reimbursement for schooling which occurred after they subsequently provided notice.

The School District's other argument is that Defendants acted unreasonably and never truly considered placement in the public school. In support, Plaintiff points to what it characterizes as a longstanding preference for private schools held by C.M.C.'s parents. The Hearing Officer considered this argument and ultimately rejected it:

> One can infer from the record that the Parents did believe throughout most of Student's educational career that a private education, including at Private School, was the best place [for] Student. However, holding such an opinion is not the same as refusing to consider alternatives. Here, the Parents did not make the commitment to Private School until after the August 2014 IEP meeting. I further find that both parties engaged in thoughtful and extensive efforts to work together to develop a collaborative educational program for Student, and that the equities do not favor one party or the other.

Doc. No. 25-2 at 19. The Hearing Officer's credibility determination that Defendants approached IEP discussions with an open mind is entitled to deference. Nothing in the record convinces this Court otherwise. Although C.M.C. attended private school for much of her educational career, her parents did place her back into public school for fifth through eighth grade. They only removed her after her emotional and psychological problems began to worsen and she suffered trauma as a result of the altercation with another student. In balancing the equities, the Court will not reduce the reimbursement award of the Hearing Officer.

### e. The Hearing Officer did not err in awarding reimbursement for transportation and summer classes.

Lastly, the School District argues that even if the Court upholds the rest of the Hearing Officer's decision, Defendants are not entitled to reimbursement for transportation expenses or summer programming. Doc. No. 25 at 14-15. The crux of Plaintiff's objections to the transportation expenses appears to be that Defendants did not present specific evidence to the Hearing Officer as to what their transportation costs would be. *Id*. The School District's cursory argument does not cite, and the Court cannot find, any statute or case for the proposition that the Hearing Officer erred in awarding transportation costs without specifics as to the nature of those costs.

The School District avers the reason C.M.C. had to take summer programming in 2015 is because she did poorly in a class during the school year. *Id*. Plaintiff argues that "it would be against public policy to order the School District to provide payment for a course that a student had to repeat due to the private schools [sic] inadequacies in providing the student with an appropriate education." *Id*. Even assuming the summer programing was a result of poor performance in a class during the school year, the School District has not pointed to specific evidence that establishes C.M.C.'s doing poorly in one class was a result of inadequate education at The University School. C.M.C. has numerous and considerable issues and it is conceivable she could need summer school in one class even with proper instruction and special education support. Absent more, the Court sees no reason to disturb the Hearing Officer's reimbursement award of transportation and summer programming expenses.

## V. Conclusion

For the foregoing reasons, the record does not support Plaintiff's claim that the Hearing Officer's decision should be reversed. Therefore, Defendants' Motion for Summary Judgment (doc. no. 27) will be granted, and Plaintiff's Motion for Summary Judgment (doc. no. 24) and Plaintiff's Motion for Relief of Judgment (doc. no. 16) will be denied.

An appropriate order follows.

<u>s/ Arthur J. Schwab</u>
Arthur J. Schwab
United States District Judge

cc: All Registered ECF Counsel and Parties